IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 23-507 |
| MACANGELO TILLMAN | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

**I.      BACKGROUND**

Defendant Macangelo Tillman was charged by indictment with five counts of wire fraud, in violation of 18 U.S.C. § 1343.  As summarized in the U.S. Probation Office's Presentence Investigation Report (PSR"), the charges arise out of an investigation that revealed that from 2015 through 2020, Tillman engaged in a scheme to steal the title to properties located in Philadelphia, PA that were the subject of future sheriff's sales. As part of the scheme, Tillman had deeds prepared that fraudulently transferred the ownership of the properties either to himself or his associates. Then, Tillman or others associated with him and acting at his direction, recorded those deeds with the City of Philadelphia. When the fraudulent deeds were recorded, they were transferred to and saved on the City of Philadelphia's Recorder of Deeds' server located in Texas. These acts deprived the City of Philadelphia of the revenue from sheriff's sales as well as the payment of outstanding taxes related to properties previously owned by deceased individuals or then currently owned by financially distressed individuals. Additionally, any balance exceeding the amount due the City of Philadelphia from the proposed Sheriff's sales would have been distributed to the homeowner. Accordingly, Tillman deprived the City of Philadelphia and the legitimate homeowner or his or her heirs potentially suffered financial losses. In particular, because the fair market value of A.L.'s property far exceeded the amount of the delinquent taxes and Tillman's fraudulent activities deprived A.L. of

monies she would have received from the scheduled Sheriff's sale.

Tillman's criminal activities victimized the City of Philadelphia as well as 11 personal victims (B.K., Y.M., S.T., R.P., N.P., A.L., M.L., M.W., E.H., G.G., and J.C.). *See* PSR ¶ 50. Because some of the homeowners were deceased at the time of the criminal conduct, their heirs stand in for them. *See* PSR ¶¶ 51-52.

Tillman also obtained notary stamps on deeds that were created to transfer title to properties by making false statements to notaries and/or using unauthentic notary stamps. He paid K.H., a notary public, $50.00 to illegitimately notarize deeds that were purportedly executed by the grantor, without the grantors being present and/or without validating the identification for the grantors. Similarly, he had notary R.J. do the same as a favor to him. On other occasions, counterfeit deeds that were presented as legitimate to the Office of the Recorder of Deeds by Tillman or others at his direction displayed the forged signatures of the titleholders and were notarized using fraudulent notary stamps. *See* PSR ¶ 14.

At present, Tillman still has a possessory interest in at least one of the stolen properties or is associated with others who he transferred interest in one or more of the stolen properties to. Tillman has failed to disclose any interest in any of the subject properties to the U.S. Probation Office and this Court.[1] The fair market value of the stolen properties at issue is $377,096.

Based on the criminal activity at issue in this case, Tillman faces an offense level of 24. He has a criminal history that includes two convictions and he began committing the offenses charged in

---

[1] At the time of the sentencing hearing, the government respectfully requests that the Court inquire about (1) Tillman's current interest in any of the properties; and (2) if he transferred ownership to others, when he did so, to whom he transferred properties to, and the proceeds of the criminal transfers of any properties. This inquiry may affect whether Tillman has not only fulfilled a material factor of his guilty plea agreement, but also whether he has accepted responsibility for his criminal conduct.

this case while on supervised release. Although charges against Tillman for conspiring to engage in the unlawful sale of liquor and related offenses were withdrawn in April 2024, the conduct occurred while he was on pretrial release in this case. He falls into criminal history category III. Accordingly, the advisory Sentencing Guidelines range is 63 to 78 months' imprisonment. The government recommends a sentence within that range.

II.     **SENTENCING CALCULATION**

    A.     **Statutory Maximum Sentence**

The statutory maximum sentence available under 18 U.S.C. § 1343 is 20 years of imprisonment, a three-year term of supervised release, a fine of $500,000 or twice the value of the property involved in the transaction, whichever is greater, and a $100 special assessment per each count. The total statutory maximum sentence if 100 years' imprisonment, three years' supervised release, a $2,500,000 fine, and a $500 special assessment.

Full restitution shall also be ordered. The City of Philadelphia is entitled to $153,685.48 and two victims reported losses of a total of $18,000, making Tillman liable for restitution in the amount of at least $171,685.48. *See* ¶¶ 51-52.

    B.     **The Sentencing Guidelines**

| Item | Offense Level | Notes |
|---|---|---|
| Base Offense Level (18 U.S.C. § 1343) | 7 | 2B1.1(a)(1) |
| Fraud Loss Total = between $250,000 and $550,000 Total - $377,096 | +12 | 2B1.1(b)(1)(G) |
| 10 or more victims | +2 | 2B1.1(b)(2)(A)(i) |
| Sophisticated means | +2 | 2B1.1(b)(10)(C) |
| Use of an authentication feature | +2 | 2B1.1(b)(11)(A)(ii) |
| Role in the offense | +2 | 3B1.1(c) |
| Acceptance of Responsibility[2] | -3 | 3E1.1(a) & (b) |
| Total | 24 | |

---

[2] See footnote 1 regarding acceptance of responsibility.

3

Tillman falls into Criminal History Category III. Accordingly, the applicable sentencing guideline range is 63 to 78 months' imprisonment.

## III.  SENTENCING ANALYSIS

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that the most appropriate sentence is one which considers the advisory guideline range of 63 to 78 months' imprisonment.

Notwithstanding the sentencing guidelines, the Third Circuit has set forth a three-step process which the district courts must follow in compliance with the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005):

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.
>
> (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation and consider our Circuit's pre-*Booker* case law, which continues to have advisory force.
>
> (3) Finally, they are to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless of whether it varies from the sentence calculated under the Guidelines.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and citations omitted) (citing *United States v. King*, 454 F.3d 187, 194, 196 (3d Cir. 2006)).

Therefore, this Court must consider all the sentencing considerations set forth in § 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training,

medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

Herein, the government addresses the relevant § 3553(a) factors.

### A.     The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

Tillman engaged in serious criminal conduct. Tillman's conduct thwarted the City of Philadelphia Sheriff's Office's ability to engage in one of its important functions, that is, to sell properties to satisfy unpaid debts. Tillman converted ownership of properties to either himself or his associates for their financial gain. Some of the stolen homes were remodeled and rented and others were sold to buyers who had no idea they were purchasing properties that had been acquired fraudulently. None of the stolen properties have been recovered by the City of Philadelphia, the owners, or the owners' relatives.

As stated previously, despite the terms of the guilty plea agreement, Tillman has not disclosed the status of any of the stolen properties identified in this case.

The seriousness of Tillman's criminal activities was recently addressed at a press conference held in late April 2025, at which Philadelphia District Attorney Larry Krasner said that many deed theft cases occur at vacant properties after owners have recently died and some of those houses are used to harbor other crimes. He added that Philadelphia has more than 10,000 properties with "tangled titles" – those whose deeds have names other than the apparent owner – and such properties are often vulnerable to theft because steps were not taken to plan for their inheritance or the administrative side of completing transactions. "It becomes a very, very difficult situation for a

family if they have fallen into this situation because they didn't really have resources to protect (their home)," Krasner said. "Some predatory thief comes in, takes it, and now they have to get access to the house. Maybe they can't even do that. ... The tangled title situation ... can become a real mess."

Tillman added to the "mess" that exists in Philadelphia. To accomplish his scheme, Tillman orchestrated the actions of numerous others, beginning with the targeting of vacant properties that were the subject of Philadelphia Sheriff's sales. He paid someone to engage in title searches to identify the properties that were the subject of these sales. With that information, Tillman paid someone to prepare the deeds that he used to transfer ownership of properties. For the most part, the actual homeowners were deceased and Tillman transferred properties to either himself, a known individual, or made up the name of an individual. He paid notaries to fraudulently verify signatures of grantors and grantees on deeds or facilitated the use of bogus notary stamps on deeds. If he did not file the fraudulent deeds with the Recorder of Deeds himself, he paid others to file the deeds. Tillman and others then converted the properties to their own use and for their financial gain, creating a "mess" to the City of Philadelphia and future owners of the properties.

Tillman and others who recorded the fraudulent deeds completed Transfer Tax Certification forms that falsely stated that the transfers were from one family member to another to avoid the payment of transfer taxes. Additionally, Tillman and others completed Owner-Occupied Payment Agreement ("OOPA") applications and submitted them, along with fraudulent documents to the City of Philadelphia Department of Revenue to avoid or minimize the payment of outstanding property taxes. The applicants claimed financial hardship to avoid paying back taxes owed on the fraudulently obtained properties. Among the fraudulent documents submitted with the applications were fake utility bills (to show residency at the properties), fake paystubs or Social Security Administration documents (to show low income) that the applicants obtained from Tillman. Once the OOPAs were

accepted, the owners of record of the properties would be in payment agreements with the City of Philadelphia and the properties would no longer be listed for sheriff's sales and the outstanding tax liabilities owed on the properties would be greatly reduced. Although the submission of fraudulent OOPA applications was a part of the scheme, unlike the electronically recorded and maintained deeds, there was no federal crime.

Accordingly, pursuant to § 3553(a)(1), Tillman's criminal activities fall squarely within the class of cases to which the applicable guidelines are addressed and the nature of the offenses and his history and characteristics counsel in favor of the recommended guidelines sentence.

> **B.** **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

The seriousness of Tillman's criminal conduct, as described above, is reflected in the applicable advisory guideline range. The government also submits that the need for the sentence imposed to reflect the seriousness of the offenses, promote respect for the law, and provide just punishment will be satisfied by imposing a sentence within the applicable advisory guideline range.

> **C.** **The Need to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant**

A factor in the sentencing determination is achieving both specific and general deterrence. As the courts of appeals have held both before and after *Booker*, deterrence under 3553(a) is not limited to deterrence of the particular defendant. *See, e.g.*, *United States v. Jordan*, 435 F.3d 693, 698 (7th Cir. 2006) (describing how Section 3553(a) "specifies that the court may consider the need for general deterrence and respect for the law"); *United States v. Glover*, 431 F.3d 744, 751 (11th Cir. 2005) (noting that pre-*Booker* and post-*Booker*, "the underlying goals of the statute and the Guidelines are retribution, general deterrence, incapacitation, and rehabilitation" (internal quotation

7

marks omitted)); *see also United States v. Yeaman*, 248 F.3d 223, 232 (3d Cir. 2001) (referring to Section 3553(a)'s goals of "general deterrence, specific deterrence, retribution, and rehabilitation").

General deterrence is an important issue here because frauds like that described in this case are a significant problem in our society. In addition to the situation that District Attorney Krasner described, according to a 2025 National Association of Realtors® Deed and Fraud Survey, 63% of Realtor® association leaders have seen or heard of deed or title fraud in their local markets over the past year. The survey indicates that deed and title fraud is particularly prevalent in the Northeast, where 92% of association leaders reported exposure to the issue. Fifty-two percent of cases involved residential land, fewer than 20% involved detached single-family homes, and 12% of fraud attempts involved owner-occupied homes. "Title and deed fraud is often a silent crime, but the damage can be very real," said Bill Lublin, president of the Pennsylvania Association of Realtors® and CEO of Century 21 Advantage Gold in the Philadelphia region. "A fraudulent filing can put a homeowner's legal rights and their property at risk. It's critical that Pennsylvanians are informed about title and deed fraud and are empowered to protect their investment."

Therefore, general deterrence may be the most compelling reason to impose the recommended guideline range.

Furthermore, a meaningful sentence, such as a sentence within the applicable advisory sentencing guideline range, should serve the purpose of specific deterrence for at least the period of incarceration. Already a convicted felon for committing bank and wire fraud, Tillman learned little to nothing from the 16-month sentence of imprisonment imposed at the time. Now, this Court has this opportunity to demonstrate the consequences of not only engaging in illegal activity but being a repeat offender. A sentence within the range of 63 to 78 months' imprisonment, therefore, achieves the purpose of specific deterrence and the imposition of an appropriate sentence for the new crimes.

### D. The Need to Provide Educational or Vocational Training, Medical Care, or Other Correctional Treatment

The government is unaware of a need in this case to adjust Tillman's sentence for educational training, vocational training, mental illness, or correctional treatment. Therefore, the government is not aware of a need to make additional adjustments contemplated pursuant to 18 U.S.C. § 3553(a)(2)(D) for this defendant.

### E. Restitution to the Victims

Tillman has agreed to pay a fine and to make restitution in amounts to be determined by the Court. The government submits that the victims identified in PSR ¶¶ 51 and 52 are entitled to restitution in the total amount of $171,685.48. Additionally, Tillman has agreed to the forfeiture of property that constitutes, or is derived from, proceeds obtained directly or indirectly from the commission of such offenses, including, but not limited to, the sum of $377,096; this would consist of Tillman relinquishing interest in the properties identified in PSR ¶ 47 and/or any other property of the defendant up to the value of the property subject to forfeiture. He can commence making payments through the Bureau of Prisons Inmate Financial Responsibility Program and continue to make payments after the completion of the anticipated period of incarceration.

## IV. CONCLUSION

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, the primary factors are the need for the sentence to reflect the nature and seriousness of the offenses, promote respect for the law, and deter future crimes. Therefore, balancing those factors supports the

recommended sentence within the applicable sentencing guideline range of 63 to 78 months' imprisonment.

Respectfully submitted,

DAVID METCALF
United States Attorney


 /s/ Anita Eve
ANITA EVE
Assistant United States Attorney

CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the Government's Sentencing Memorandum has been provided via email and ECF filing to:

        Gerald A. Stein, Esquire
        gastein@geraldstein.com

        /s/ ANITA EVE
        ANITA EVE
        Assistant United States Attorney

DATED: July 7, 2025